I started the last one by indicating good morning, Your Honor, so I'll do this one good afternoon, Your Honors. Here we are now talking about the second case, the Vista De Santa Barbara case, in many ways similar to the first case that we heard. I want to make a couple of points. First off, neither of these two courts and neither of these cases reached the merits. In other words, made any inquiry concerning whether or not the ordinance did or did not substantially advance legitimate governmental purpose. And as a result, it would be, I think, any argument along the lines of, well, since then we've figured out that the substantial advancement test is an inappropriate test or something, I think it nonetheless would need to be remanded to the district court. Both of these cases were disposed of on procedural grounds, rightness and statute of limitations. Next, the city argues that the stated purpose of the ordinance in Vista De Santa Barbara, or the purpose of the ordinance in Vista De Santa Barbara, was to protect against unreasonable rent increases and to preserve the equity that homeowners have in their home. First off, with regard to the protection of equity, I think that that, in fact, makes the point of the appellant in this case, because protection of equity really is simply shorthand for preservation of the premium. If the premium is unconstitutional and unlawful, at the start, the perpetuation of that premium is equally improper and unconstitutional. And the demonstrable evidence will be at time of trial, I would submit, and not at this pleading stage, that there is a huge premium attributable to these homes and that that premium is as a result of the existence of this rent control scheme. As to the supposed stated purpose being, quote, unreasonable rent increases, close quote, obviously all rent control laws seek to depress rent levels, seek to hold down rent levels. But that is merely the means to an end. Stopping rent increases is not an ending of itself. It has to be tied to something, such as the maintenance of affordable housing stock or some other stated purpose. So I certainly don't think you can say keeping rents down is a legitimate governmental purpose in and of itself. When I asked you in the last case what your remedy was, you said that you wanted us to declare the ordinance unconstitutional. That's right. So how can we do that on a procedural ground? What's the basis for declaring it unconstitutional? That it fails to substantially advance a legitimate governmental purpose. What you just told us is that the procedural history court should declare it. I apologize if I gave that impression. I'm not suggesting that this Court should declare the ordinance unconstitutional today. I'm suggesting that we should have an entitlement to our day in court. All right. That these procedural impediments that have hampered property rights owners. You answered the question. Thank you. Thank you. I would also submit that I know of no other 1983 sort of claim that is subject to this same gauntlet of procedural impediments. Williamson, statutes of limitations, issue preclusion. Which, by the way, issue preclusion will be the very next thing that we'll hear. If we are forced to go through the state court system, then we will come back to this court and ask for relief. And we will be told by the city, because they've said it before in numerous other cases of this nature. They'll say, well, you can't litigate these claims in federal district court. You've already had your day in court. And while you may have not, while you may not be subject to issue preclusion because you preserved your federal rights or you purported to preserve your federal claims, you're nonetheless subject to claim preclusion because the California courts have decided all of these factual issues on which your federal constitutional claims depend. I submit that, once again, the doors to the federal courts would be barred. And I again ask the somewhat rhetorical question. There must be, if you start from the premise that there has to be a way for an aggrieved property owner, an aggrieved citizen to vindicate their rights under the Fifth Amendment to their property and to not have their property taken from them, if you start from that premise, then all we need is a roadmap. What we need is for someone to tell us, preferably I'd love to hear it from the city, how do you go about doing that? And right now, what they will do is they will tell you, well, you can't do it this way, you can't do it that way. But what they won't do is they won't say, look, here's a reasonable procedural mechanism that allows you to gain access to the federal courts. The city argues that all of these claims are facial claims and that they should all be considered as facial claims, all these substantial advancement claims. Here, in fact, the ordinance was definitely applied, and it was applied to us. We went into court. We sought the relief. We did exactly what Hacienda and Ventura told us to do. We said, and we were very upfront about it, because remember, in Hacienda, the one of the criticisms that the Hacienda court utilized as the basis for denying our claim was that we had failed to make it clear to the city when we went through the administrative process that this was their opportunity to treat us fairly, that this was their opportunity to provide us with rent levels that did away with the premium, that this was their opportunity to make sure that we received just compensation, to the extent we were seeking a just compensation remedy. So we did all those things very, very clearly, not only in this Vista de Santa Barbara case, but also in the prior case, the Stardust case. Also, taking lessons from prior cases, we filed England reservations in both of these cases. Now, I understand an England reservation has historically been deemed to be an abstention type of mechanism, but we have filed England reservations indicating that we don't want our Federal claims litigated by either the State administrative agency or the State courts. We want them litigated in the district court. So we've done everything we can conceivably do to protect our right to be in Federal court and to have this court entertain our claims. And you have to understand the backdrop here, I guess. We also have a city. Why is the city fighting so hard to keep these cases out of the Federal courts, out of the Federal district courts? The reason is, is because they know that the California Supreme Court and the California courts are not embracing the Federal standard. They're not embracing the Federal remedies. And they certainly know that the local trial, California State trial courts and the local administrative bodies, particularly the administrative bodies, are incredibly politically motivated, extraordinarily politicized. And that is the basis of our procedural due process claims, part of the basis of our procedural due process claims, and our OLEC-WILLOWIC equal protection claims. We're totally divorced from politics. Thank you, Judge. Judge Pregerson, I always knew that about you, but it's nice to hear that reaffirmed. It's nice to hear that reaffirmed. Counsel, was this the case in which you got charged a fee for holding the hearing? We got charged two fees. We got charged, I think at the outset, something like $8,000 or something, and then subsequently they hit us up for another $1,300, which to a small park owner... These were fees for the administrative cost of conducting the hearing? Absolutely. Is it a set fee? Is it an X fee? How do they estimate it? The city clerk estimates... I don't know how they estimate it. They simply say, we're not going to hold the hearing until you pay us X dollars. Is it estimated in advance? No, not in advance of the application. We file the application. They come back to us and they say, we're not going to schedule a hearing unless you pay us X dollars. So we have a choice of either going into state court on a writ proceeding or paying the money to go through the process. But remember, in this case, they then increased the fee midway through it. They said, well, we're not going to go any further unless you pay us X dollars. I'm sorry, I missed something. You said that you have the option of doing one thing or the other? What were the two things I missed? $1094.5 or $1085 writ of mandamus to state court saying they're treating us unfairly, they're not supposed to charge this fee, or we can pay the fee. Or I guess the third option... Is there any accounting by the city for the cost of conducting the hearing? It's not reflected in the record. Did you ask for an accounting? Yes. And they didn't give you any accounting at all? Honestly, Judge, I don't recall. I do know it's not in the record. Are you aware of any other proceedings in California in which participants are charged a fee for the administrative cost of the hearing? Absolutely. The city of Santee... Any other projects other than the mobile home?  I practice extensively in the mobile home park field, and I can't think of any other... I can tell you that probably at least a quarter to a third of the jurisdictions that have mobile home park rent control in California do this kind of fee-setting arrangement. Many of them have the park owner pay a fee on a per space basis annually, and then they do a look-back, and they say, well, how much did the city spend on enforcing its rent control? Ordinance, and then they say, well, then we're going to charge you $5 per space per month in the coming year. But these fees clearly are First Amendment issues, as far as I'm concerned. These rent control situations, say, in the city of Carpinteria, are they just limited to mobile homes? They don't put rent control on apartment houses or anything else? No, for a couple of reasons. First off, because apartment landlords are less politically unattractive, I guess, than mobile home park owners. What does that mean? Mobile home park owners represent a perfect political target for city councils and rent review boards and rent review board members that have their eye on the local city councils that are appointed by the rent review boards, as we've pointed out in this case. They're absentee landlords much of the time versus 300 or 400 highly politically motivated residents who charge down to the city council chambers and charge down to the city council chambers and charge down to the city council chambers. They charge down to the rent control board hearings, and they have every right to do that. But I'm just telling you, it's a... Well, remember, apartment house folks typically don't have just cause eviction laws. They don't have all of these other panoply of protections provided under California's mobile home park residency law. And I just know that most apartment rent control laws that were in existence have been phased out. And the reason they've been phased out is because when the state passed the law that said you had to provide full vacancy decontrol, then most of the cities said, well, then we don't want to administer a rent control scheme anymore. In other words, when there's a vacancy, then you just rent control. That's the whole problem here, or much of the problem, is that we simply can't bring rents to market. There's no opportunity to adjust rents. And the strange thing is that a tenant will sell their home for, say, $150,000, and it has a blue book value for $10,000 or $15,000 or $20,000. They'll sell it for $150,000, and remember, that tenant leaves the jurisdiction. That tenant leaves the city. So you have to ask yourself, what purpose is being advanced by this? We're simply lining the pockets of an incumbent tenant that's no longer going to be involved in the city. You talk about wanting to protect residents who can't afford the rent. Well, you've just taken $150,000 out of the system, and what have you done? You've saddled the new incoming tenant with just that. You've saddled the new incoming tenant with a mortgage for $150,000 or $130,000 that they shouldn't have had in the first place. So I see my clock is saying stop on this one as well. I hope I have reserved at least one minute at the end of this. Thank you. Good afternoon, Your Honors. Don Lincoln for the City of Carpentria and the Rent Review Board. This has been an interesting argument. A lot of it has been obviously outside the record. It's hard to know where to start here. A few things mentioned second homers. Well, you failed to mention that there is a law that says that if it is a second home, it isn't California. It isn't subject to rent control. The question of why mobile home rent control is different as far as vacancy control than apartment rent control, that's been a political issue. In 1999, there was a proposition, 199, went to the people of California where that specific issue was raised as to mobile home rent control, and they struck down or did not pass a proposed initiative that would have eliminated vacancy control for that. It has been a political issue. They lost at the political issue. They're now in the courts, and they've been in the courts in a variety of cases. I'd like to know what's going on in this world. This whole theory started in Hall. That was struck down in the Yee case. They then went to the regulatory taking. That has had some difficulties. One of the difficulties was the statute of limitations for facial claims. They don't say that the statute of limitations doesn't apply to facial claims. They say they don't have a facial claim. Well, if they don't have a facial claim, if it is an as-applied claim, then it's the rent decision that was the application. If it's the rent decision that was the application, this whole theory that comes out of Richardson and Chevron and Cotati, that there's no mechanism to prevent a premium, they just said there is one. And that mechanism to prevent the premium is to go in with a rent increase application. That's exactly what they did. They went in with a rent increase application in carpentry and asked for a $900 rent increase. As we point out in our brief, the position that they're arguing is apparently that a $900 rent increase is going to help affordable housing. Suffice it to say, there was a lengthy administrative hearing. The record runs 4,500 pages. There were four days of evidentiary hearings before a hearing officer at which the cross-examination occurred of their experts arguing that there was a premium. Other experts, including the residents, saying there was no premium. There was a decision by an administrative law judge, a hearing officer, finding that there was no premium. That in any event, a $900 a month rent increase would wreak substantial economic havoc on persons who may never sell their mobile home for the presumed inflated sales price. That's at EOR 69. The hearing officer's decision is attached to the complaint. It went up. Incidentally, the hearing officer noted there in their briefs, they argue that one of the purposes of the ordinance is not the preservation of the investment. The hearing officer, and I'm quoting again from EOR 69, the hearing officer is persuaded by the Sandpiper decision that one of the legitimate purposes of the ordinance is preservation of the mobile home owner's investment in their property. So long as that is accomplished at the same time that landowners received a just and reasonable return. Sandpiper was the case he was referring to. That was a case involving this very ordinance. A state court decision decided after ye, where they allowed additional briefing after ye as to whether or not regulatory taking applied to this ordinance. The California Court of Appeal in a reported decision said this ordinance meets the Nolan test. It substantially advances a legitimate state interest. It seeks to remedy an inequitable market situation caused by the scarcity of mobile home sites. It seeks to protect mobile home owners' investments and also provide park owners with a reasonable return on their investment. That is the standard that has been used in California. It's the standard that we believe should be applicable here. Why is the focus of carpentry, that's a very nice area. Yes sir. Why is the city of Carpentaria focused on mobile homes and not on single family dwellings or apartments? I don't know the exact history. I do know there are several mobile home parks in Carpentaria. Although it's a relatively small community, there are six or seven mobile home parks there. They are primarily, as is this particular one at issue, residents. The residents are senior citizens and people who are less able economically. It is their lower cost housing in that area. The idea is to protect that. The idea, incidentally, that there is a premium. First of all, there was testimony before the administrative law judge. The administrative law judge found there was no premium. That issue will be taken up in the state court proceedings. There is a companion state court proceeding. To determine a premium, you always have to have a base. There were two different series of experts, but the two main experts. Their expert used as a base from which to measure a premium. I'll call it a depreciated book value, but basically not what the homes have been selling for, actually, but a book like the Kelly Blue Book for cars, but a similar procedure which values mobile homes, not in place, not in a park setting, but in the absence of being a park setting, what would they be worth? He used that as the base and then compared it to what they were selling for. Homes in that area... I think the average home in Carpentry is probably in the $400,000 or $500,000 range. Mobile homes are probably in the... $80,000 to $100,000 range. It's still the lowest cost housing there. Other experts said, if you're really measuring premium, why don't you look and see what mobile homes sell for in areas where they don't have rent control? In a similar situation where there's no rent control, what would a mobile home sell for? There was testimony from other areas where there was no rent control. He concluded, for example, Carlsbad. I don't know if you're familiar with that. Carlsbad doesn't have rent control. It's another beach community. The homes there were selling for approximately the same as they were in Carpentaria. His testimony, which was accepted, was that there was no premium. If you compare it with what... Don't you look at them in an area where there isn't rent control. Similar location, along the ocean. That was his testimony. Those issues, the hearing officer agreed with that testimony. The board agreed with the hearing officer. That evidence and administrative record, 4,500 pages, is going to be heard before a state judge. Just last week, she set the hearing on that issue for September 16th. That's in Superior Court, yes. In Santa Barbara Superior Court. What about the increased value of the land that the trailer park owner owns? In the Yee case, State Court case, they talked about complementary. Both the land and the mobile home each have an interest in the business. The park owner has an investment in land. The residents have an investment in their mobile home. Incidentally, in almost every instance, including this one, the mobile home's total investment, the mobile home owner's investment in their mobile homes is actually greater than the park owner's investment in his land. Together, they have a combined investment. The park owners bought that land because it was cheap and they made a mobile home out of it. So the people could pay rent and they could maintain the property, maybe live on it, maybe make a little money, but they're thinking about that appreciation. And it is appreciating. The property is appreciating and they're sharing. Not in proportion to the nature of the investment. If you put a mobile home on a piece of property, you run the risk that that property is going to escalate in value. You're not participating. That's not the nature of your investment. Because you're not buying fee title. Your Honor, there is a case called Casella. It's like buying a car. They don't go up that much. They go down. One of the reasons that they're trying to put more protections is because of that very issue. You're putting a piece of property onto somebody else's land. In Casella, it's 226 something. This question came up as to who really, under California law, who really has that property. Casella, as a matter of California law, says it's really a split. In other words, the park owner says it's totally the property owners. The state court does not agree. When a mobile home owner puts his property on there and has a lease, he can share in the appreciation of that property. He has a lease. He has a lease. That's correct. I thought these people didn't have leases. Yes, they all have leases. The question is the length of the lease. Yeah, sure. But they all have leases. Nobody's saying they're illegally on that property. Oh, I know. Counsel, would you address the question of the fees for the hearing? Yes. First of all, as we pointed out in our brief, it is not unusual to have fees for hearings. In fact, this court, the Ninth Circuit, in a case which we cite on page 41, Amber Hill Properties v. City of Berkeley, I'm reading from the court, rejected claim that $13,000 rent application was excessively burdensome on its face. Carpentry, as most of the jurisdictions that have rent control, has either an application fee or a fee on the process itself. The application fee in this case, they paid the original fee. They were assessed a secondary fee because this hearing took a long time. It was four days of evidentiary hearings. They had hearing officer fees. They did not pay the second assessment. The city nevertheless chose to go ahead with it. Now, can they recover that fee? They can recover it in two different ways. One is that in future rent hearings, the cost of that particular fee is an expense, which then goes into the their return. It will be an expense that they can recover it that way. Another possible way to recover that... Yes. Another possible way is in the Kavanaugh and Galan cases. In Galan, they specifically said that if a park owner is successful in overturning a rent decision, then he should receive as part of his, remember, additional rent an amount to make up his costs, including the administrative fees. For example, first of all, here under the ordinance, the hearing officer could have awarded at the time of the hearing that fee. He chose not to. I'm sure that's going to be one of the appeals, one of the issues on appeal. The superior court could overturn that and award it. Or if they overturn the whole thing, they could award it that way. Or, as I said, it would be in the next rent application. Okay. Thanks. Thank you very much. Anything else? First off, with respect to the question of the residents' quote, investment, close quote, in the property, the residents have the home, which is a depreciating piece of personal property. They have skirting, masonry in some instances, a shed perhaps, and some landscaping. All of that's been discussed. And the bottom line is you can take a 1971 single-wide Fleetwood mobile home sitting on a space and put all those accoutrements on it, all those investments on it, and it will still amount to $15,000, $20,000, $25,000, maybe $15,000. In fact, in most cases, it has a negative value because anyone who's going to buy a mobile home like that in a park and you can depreciate it. Is that what you're saying? I'm saying that a homeowner does to the extent a homeowner has an investment. I thought you said earlier you buy a mobile home, you put it in a park and you can depreciate the cost of the mobile home. The tenant suffers depreciation. The tenant purchases a piece of personal property that declines in value. Not the park owner. They don't get to share in the value of the land of the property owner because they didn't buy it. They didn't risk any money for it. Thank you, Judge Fragerson. I appreciate your questions. Thank you. Thank you. Good argument. We'll recess until called.
judges: Pregerson, Fisher, Bybee